**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 18-18234 (KHT) |
| COOL FROOTZ, LLC, | ) | |
| a Delaware limited liability company | ) | Chapter 11 |
| EIN: 20-0873295 | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MOTION OF DNS-FROOTZ, LLC,
AS COLLATERAL AGENT, FOR (A) ENTRY OF AN ORDER MODIFYING THE
AUTOMATIC STAY OR (B) ALTERNATIVELY, CONVERSION TO CHAPTER 7**

DNS-Frootz, LLC, as collateral agent on behalf of itself and the other secured parties (in such capacity, the "***Collateral Agent***") under the secured notes issued by the above-captioned debtor and debtor-in-possession (the "***Debtor***"), hereby moves (this "***Motion***") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"), (a) modifying the automatic stay under section 362 of the Bankruptcy Code (as defined below), or, alternatively, (b) converting this chapter 11 case to a case under chapter 7 of the Bankruptcy Code, and respectfully states as follows, on information and belief:[1]

## PRELIMINARY STATEMENT

1.      The time has come for the Debtor to acknowledge what the facts make clear in this case: the Debtor's business will not survive. Furthermore, because the Debtor has refused to fulfill its fiduciary duties to its estate and constituents, the Collateral Agent hereby requests that the Court force the Debtor to do so by permitting foreclosure against the secured noteholders' collateral or,

---

[1]      This Motion is supported by S2G Ventures, holder of $1,800,000 of secured notes, approximately 48 percent of the total convertible notes issued by the Debtor.

in the alternative, converting this case to chapter 7 and replacing the Debtor's equity-beholden management team and board of managers with a trustee.

2.      The Collateral Agent does not make this Motion lightly.   After the contested October 9 hearing and entry of the Court's Cash Collateral Order,[2] the Collateral Agent waited patiently for the Debtor to live up to its promises.  Through no fewer than forty-seven defaults of its budget covenant, repeated reporting inaccuracies, and two separate failures (out of two chances) to file updated thirteen-week budgets, all in violation of the Cash Collateral Order, the Collateral Agent waited, preserving its rights and holding off on seeking relief from the Court.

3.      Two "proposals" were made by management, neither of which paid any heed to the secured noteholders' rights or the standards and process for confirmation of a chapter 11 plan, and neither of which the Debtor progressed beyond high-level hypotheticals.  For example, one term sheet contemplated reorganized equity splits that implied a *$10 million* valuation for the Debtor's business and the Debtor's current equity holders receiving 18 percent of the new equity (despite not contributing any new value).  Further, both "proposals" would have required the secured noteholders to provide at least $800,000 of new financing to the Debtor, for which the noteholders have zero appetite.  Questions and requests for calls by the Collateral Agent went unanswered for days at a time.  Four weeks passed, then six, then eight—plenty of time for the Debtor to develop a reorganization plan, according to testimony at the October 9 hearing.  But no plan (or even financing to facilitate a plan or further operation in chapter 11) has materialized.

4.      Meanwhile, the Collateral Agent's collateral has diminished in value materially. Equipment has continued in use and suffered normal wear-and-tear or worse, and based on the

---

[2]      "*Cash Collateral Order*" means that certain *Final Order Authorizing Use of Collateral and Granting Adequate Protection Under Sections 362, 363, and 364 of the Bankruptcy Code* [Docket No. 77].

Debtor's failure to make a recent insurance payment in accordance with its own budget, the Collateral Agent is unsure whether the equipment (or other assets) is even being properly insured.[3] Tens of thousands of dollars of inventory has been sold but *not* replaced with new collateral— whether new inventory, accounts receivable, or otherwise. And cash has disappeared out the door at an even greater pace than the Debtor's first grim budget projected. In total, and as detailed further below, *the Debtor's own reported book value of the Collateral Agent's collateral has decreased by at least $160,000 (almost 20 percent of the Petition Date value)*, even accepting the Debtor's incorrect position about the scope of the Collateral Agent's prepetition and adequate protection liens. Based on the Collateral Agent's own position, that diminution in value increases to $260,000, more than 25 percent of the Petition Date value.

5.     In light of these developments and the Debtor's failure to take action or make progress, on December 18, 2018, the Collateral Agent and the secured noteholders sent a letter to the Debtor's board making it clear that they would under no circumstances provide any financing to the Debtor and that they did not support a reorganization of the Debtor's business. In the December 18 letter, the noteholders specifically requested that the Debtor agree to relief from the automatic stay for the Collateral Agent or convert its case to chapter 7.

6.     The Debtor's response, as indicated by the filing of this Motion, was to decline. Therefore, on December 27, 2018, the Collateral Agent exercised its right under the Cash Collateral Order to terminate, immediately and automatically, the Debtor's authority to use or dispose of the Collateral Agent's collateral. Assuming the Debtor is complying with the Cash

---

[3]   The Debtor's November 30 budget indicated that a $5,300 insurance payment was to be made the week of December 10. The December 14, 2018 and December 28, 2018 budget reconciliations showed that this payment still has not been made. The Collateral Agent understands based on recent communication from the Debtor that this payment is due January 2, 2019.

3

Collateral Order, it should currently not be operating its business in any meaningful fashion because it has neither the authority nor the cash to do so.

7.      Put simply, this case exemplifies the circumstances in which the ordinary motivations of chapter 11—preference for reorganization and deference to a debtor's management—must be left behind.  The secured noteholders are deeply underwater; the Debtor no longer has the legal authority or practical ability to operate and wastes collateral value with each passing day; and no proposal has surfaced in over three months, from the Debtor or otherwise, for DIP financing or a restructuring that is economically acceptable or legally viable.  In this situation, relief from the automatic stay and/or conversion to chapter 7 are not only appropriate, but required by the Bankruptcy Code.  Accordingly, the Collateral Agent requests that the Court enter the Proposed Order.

## JURISDICTION

8.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Collateral Agent consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 362 and 1112 of the Bankruptcy Code (as defined below) and rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**_Bankruptcy Rules_**").

## BACKGROUND

9.      On September 20, 2018 (the "***Petition Date***"), the Debtor filed a voluntary petition in this Court commencing a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***").   The Debtor continues to manage and operate its businesses as debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.   No official committee has been appointed in this chapter 11 case.

10.      As reflected in its proof of claim [Claim No. 1], the Collateral Agent serves as collateral agent for the holders of secured convertible promissory notes (the "***Secured Notes***") issued under that certain Convertible Note Purchase Agreement, dated as of October 13, 2017 (as amended and restated as of May 11, 2018, and as further amended from time to time, the "***NPA***"). On information and belief, there were approximately $3,720,000 of convertible promissory notes (by principal amount outstanding) as of the Petition Date, including the Secured Notes (constituting at least $3,635,000 of the Secured Notes) and some notes that may be unsecured, all of which matured on October 12, 2018.   To secure its repayment of the Secured Notes and its performance under the NPA, the Debtor granted the Collateral Agent, on behalf of itself and certain holders of the Secured Notes, security interests in and liens on substantially all of its assets, other than accounts receivable securing a separate credit facility (the "***Prepetition Collateral***"), pursuant to that certain Security Agreement, dated as of May 11, 2018, by and among the Debtor and the Collateral Agent (the "***Security Agreement***") and that certain Intellectual Property Security Agreement, dated as of May 11, 2018, by and among the Debtor and the Collateral Agent (the "***IP Security Agreement***").   The Debtor also agreed to indemnify the Collateral Agent for all expenses incurred in connection with the Notes.

US-DOCS\105018314.5

11.     After a contested hearing on October 9, 2018, the Court entered the Cash Collateral Order.  Under its terms the Debtor was authorized to use the Collateral Agent's prepetition and postpetition collateral (including collateral subject to the adequate protection liens granted therein).  Among other conditions to that authority, the Debtor was subject to an obligation to submit biweekly reports to the Collateral Agent of its actual cash flows against its budget and to file updated thirteen-week cash flow budgets by the end of each calendar month.  Further, the biweekly reports were subject to a ten-percent, line-item variance test, meaning that if any line item therein indicated a negative variance from the budget greater than ten percent, the Collateral Agent would have the right to terminate use of its collateral immediately upon notice to the Debtor.  *See* Cash Collateral Order, ¶ 4(e).  The Debtor has breached this budget variance covenant as to dozens of line items since the Cash Collateral Order was entered, including no fewer than six breaches in **each** report it submitted.  The Debtor has also failed to file cash flow budgets covering a full, thirteen-week period by the end of October 2018 or November 2018 as required by paragraph 4(d) of the Cash Collateral Order, instead opting for budgets lasting only for the following calendar month.  Paragraph 4(f) of the Cash Collateral Order further requires that the Debtor insure its assets, and the Debtor's current insurance premium payment due January 2 remains unpaid today.

## DIMINISHING COLLATERAL VALUE

12.     The Debtor has stated that the Secured Notes are, indeed, secured by valid and enforceable liens and were, in fact, significantly undersecured on the Petition Date.[4]  With that

---

4     *See, e.g.*, [Docket No. 13, ¶ 6] ("Given the amount of cash, accounts receivable, and inventory, the three secured creditors [including holders of the Secured Notes] are very under-secured with respect to cash collateral issues."); [Docket No. 120 at 6-7] (listing balance sheet asset values other than "Start Up Expenses" of $1,262,877.34, in aggregate).

noted, the Debtor and the Collateral Agent disagree about the scope of the Collateral Agent's liens. Specifically, the Collateral Agent believes it holds valid and enforceable security interests in substantially all of the Debtor's assets, including all accounts receivable (now that the Debtor's receivables factoring facility has been retired) and cash; and the Debtor disagrees. In either case, however, the Collateral Agent was granted a postpetition adequate protection lien on inventory and accounts receivable under the Cash Collateral Order, and given the Debtor's extremely limited cash holdings, it is plain that the Collateral Agent has liens on substantially all the *value* of the Debtor's chapter 11 estate.

13.     Taking the Debtor's most recent monthly operating report [Docket No. 120], a copy of which is attached hereto as **Exhibit B**, both the Collateral Agent's undersecured status and the diminishing value of its collateral are obvious. Set forth below is a table summarizing the key balance sheet figures:

| Collateral | Petition Date | November 30 | Diminished Value |
|---|---|---|---|
| Bank Cash | $82,385.96 | $22,705.43 | $59,680.53 |
| Undeposited Funds | $2,499.00 | $0.00 | $2,499.00 |
| **Total Cash** | **$84,884.96** | **$22,705.43** | **$62,179.53** |
| **Accounts Receivable** | **$38,148.38** | **$0.00[5]** | **$38,148.38** |
| Inventory Raw | $179,418.57 | $173,464.65 | $5,953.92 |
| Inventory Finished | $171,222.13 | $65,752.92 | $105,469.21 |
| **Total Inventory** | **$350,640.70** | **$239,217.57** | **$111,423.13** |
| Property & Equipment (net of D&A) | $277,603.51 | $228,215.77 | $49,387.74 |
| *- less Cont. Serv.* | *$20,950.98* | *$20,950.98* | *$0.00* |
| **Total P&E** | **$256,652.53** | **$207,264.79** | **$49,387.74** |
| **Leasehold Improvement** | **$268,834.80** | **$268,834.80** | **$0.00** |
| **Deposits** | **$6,471.18** | **$7,171.18** | **($700.00)** |
| **Intellectual Property** | **$13,743.40** | **$13,743.40** | **$0.00** |
| **Total** | **$1,019,375.95** | **$758,937.17** | **$260,438.78** |

---

[5]   Accounts receivable for November 30 were disclosed as ($5,649.43). Rather than include a negative asset value, this table adjusts the figure to $0.00.

14.     Based on these book values, the Collateral Agent's collateral diminished by more than $260,000 from the Petition Date through November 30, 2018, more than 25 percent of the Petition Date value.  Alternatively, even accepting the Debtor's view of the scope of the Collateral Agent's interests, the collateral (meaning the assets listed in the table above, less the Total Cash and Accounts Receivable items) has declined in value by more than $160,000, or about 18 percent of the Petition Date collateral package.[6]

15.     This diminution is corroborated by the biweekly cash flow variance reports the Debtor has delivered to the Collateral Agent.[7]  In particular:

- Petition Date cash holdings of $84,884.96 have diminished to $28,705.53 as of December 14, 2018;

- the Debtor has collected $77,007.22 on orders paid in advance, meaning no accounts receivable (which are supposed to serve as the Collateral Agent's replacement collateral for inventory sold under the Cash Collateral Order) were generated at all, and instead cash was received directly and promptly spent; and

- the Debtor has spent only about 52 percent (including only 20 percent over the last two weeks) of what it budgeted on forecasted accounts payables, which a witness for the Debtor has stated is the line item incorporating expenses to purchase new inventory and raw materials[8]—the budgeted figure itself already contemplated a $50,000 decline in inventory levels during the period since the Petition Date (according to the same testimony).[9]

---

[6]   For the avoidance of doubt, the Collateral Agent acknowledges that the "PACA Claimants" assert statutory trust rights over the Debtor's raw fruit inventory and receivables and cash generated from sales of that inventory.

[7]   These reports are attached hereto as **Exhibit C**.

[8]   *See* Hr'g Tr. at 74:7-10 (Oct. 9, 2018) (testimony of R. Naha, Chairman of the Debtor, attached as **Exhibit D**):

Q:   ...if one looks at this budget, where would one find the disbursements for purchasing new fruit, new raw materials?

A:   In the forecasted accounts payable.

[9]   *See id.* at 76:6-9:

A:   ...[T]o produce all of the purchase orders we think, we think our inventory would be decreased by $50,000, so we would have $50,000 less raw and finished inventory than we do today in order to send those orders out.

*Id.* at 77:10-13:

US-DOCS\105018314.5

Also noteworthy is the fact that the Debtor failed to make an insurance payment that was budgeted for the week of December 10.  That payment has not been made to date, although the Collateral Agent was informed today that it is due January 2.

16.    Importantly, because the value of *every significant asset* the Debtor has is steadily decreasing, and because the Collateral Agent has liens on nearly all of the value in the estate, there is simply no means of adequately protecting the Collateral Agent's security interests.  The holders of the Secured Notes are already out hundreds of thousands of dollars, and the decline now appears certain to continue.

## FAILED RESTRUCTURING "PROPOSALS"

17.    Despite the Debtor's bold proclamations at the October 9 hearing of a 30-day timeline to an exit plan,[10] no proposal has been brought to the Collateral Agent's attention to date that is remotely actionable.  To the best of the Collateral Agent's knowledge, there have been no committed proposals for DIP financing, financing for a chapter 11 plan transaction, or serving as a stalking horse bidder or private buyer in a sale process, let alone interactions reaching the point of negotiating documentation (when discussions still can, and often do, break down).  And of

---

       Q:   You just testified that [the Collateral Agent's] exposure is --

       A:   Oh yeah.

       Q:   -- is negative $50,000 of inventory.

       A:   Sure.  I made that estimate, yeah.

[10]   *See id.* at 30:10-19:

       Q:        So are you looking for more than 90 days to get through this due diligence period with these potential purchasers?

       A:        No, I would say 60 days at the absolute most.  I think 30 days would be a fair amount of time as we continue operations, keeping customers happy, shipping orders.  Thirty days we could have offers on our table from legitimate business people to either buy out the debt-holders or to buy the company.

       Q:        Or invest?

       A:        Or invest, yeah.

course, the Debtor has not filed any motion for DIP financing, chapter 11 plan or disclosure statement, or anything else indicating it has a path out of bankruptcy.

18.     What the Collateral Agent has seen to date is a continued pattern of disregard for the secured noteholders' legal rights and for the difficult realities facing the Debtor in this chapter 11 case.  The noteholders are secured by substantially all of the value the Debtor has as of today.  Even assuming the Debtor's view on liens, supposedly unencumbered value would consist exclusively of cash, as the Collateral Agent's adequate protection liens likely would absorb any accounts receivable that have accrued since November 30 (when the Debtor reported a negative value for receivables).  The noteholders are also likely dramatically undersecured, so that any deficiency claim they have likely will dwarf all other claims against the Debtor combined. Importantly, the Collateral Agent has engaged with the Debtor to emphasize these circumstances and what they mean for any restructuring transaction—specifically, that the secured noteholders are legally entitled to substantially all of the value of any reorganized business here.

19.     Yet, the most the secured noteholders have been offered in any "proposal" is 55 percent of the "hypothetically" reorganized equity, while current equity has consistently been set to retain at least 10 percent (with management, many of whom are also current equity holders, being entitled to another 10 percent).  If these constructs show what the Debtor wants for its path forward, further floundering in chapter 11 makes no business sense.  The Debtor simply will never have the votes to confirm a chapter 11 plan, let alone propose a plan that actually satisfies section 1129 of the Bankruptcy Code.

20.     The Collateral Agent has concluded that there simply is no prospect of a viable reorganization for the Debtor.  The time is now for the Debtor to shift to an orderly liquidation and wind down through an orderly foreclosure and/or chapter 7 process.

## BASIS FOR RELIEF

21.     Upon filing a relief from stay motion, the initial burden of going forward to show the grounds that compel the lifting of the stay rests with the creditor.  *See In re Anthem Communities,* 267 B.R. 867, 870–871 (Bankr. D. Colo. 2001). Once grounds have been established, the moving party need only prove the issue of lack of equity in the property.  *See id.* The burden of proof thereafter rests with the debtor as to all other issues, including adequate protection.  *See id.*; 11 U.S.C. § 362(g).

**I.      Cause Exists to Modify the Automatic Stay to Permit the Collateral Agent to Foreclose on Its Collateral.**

22.     The automatic stay should be modified to permit foreclosure on the Collateral Agent's collateral because sufficient cause exists under section 362(d)(1) of the Bankruptcy Code, including, the Debtor's inability to adequately protect the Collateral Agent's security interests therein and its bad faith in filing and pursuing this chapter 11 case.  Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that a court "shall" grant relief from the stay "[f]or cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

**A.      Lack of Adequate Protection**

23.     Section 361 of the Bankruptcy Code, in turn, contains an enumeration of forms of adequate protection, including cash payments and additional or replacement liens.  *See id.* at § 361. However, the listing in section 361 is non-exhaustive, and what constitutes adequate protection "is to be decided flexibly on the proverbial 'case-by-case' basis."  *See In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987).

24.     "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy."  *Id.*  The court's

"first effort...must be" to make sure the value of the secured creditor's collateral will be preserved. *See id.*

25.     As demonstrated by the Debtor's own pleadings, operating reports, and cash flow reports, the value of the Collateral Agent's collateral has already fallen drastically during these chapter 11 cases, even accounting for (a) the Debtor's view of lien scope and (b) the adequate protection liens granted to the Collateral Agent on receivables.  The root cause is straight-forward and exactly what the Collateral Agent feared from the beginning—the Debtor continues to operate at a loss and is not fully replenishing inventory.

26.     More importantly, though, the Debtor's situation is so dire that there is no plausible way of providing adequate protection for the Collateral Agent going forward.  The business has all-but shut down, even before the Collateral Agent's termination of collateral use.  The Debtor collected ***eleven dollars ($11)*** during the week of December 10.  Cash is at dangerously low levels, consistently below the Debtor's aggregate payroll, rent, and insurance obligations.  It is not certain that the Debtor will continue to maintain insurance on the collateral.  The Debtor has told the Collateral Agent repeatedly that it lacks the funds to fulfill future orders.  In this circumstance, the only way to "insure that the [secured noteholders] receive[ ] the value for which [they] bargained prebankruptcy" is to allow the Collateral Agent to foreclose on the collateral and dispose of it in the way it views as maximizing value—which is what the secured noteholders bargained for prebankruptcy.

## B.     Bad Faith

27.     A debtor's bad faith in commencing a chapter 11 case may also constitute "cause" for modifying the automatic stay under section 362(d)(1).  *See In re Gunnison Ctr. Apartments, LP*, 320 B.R. 391, 401 (Bankr. D. Colo. 2005).  In particular, "if there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison*

*d'etre*....Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions." *Id.* (quoting *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986)) (internal quotation marks and alterations omitted).  Courts look to a "conglomerate of factors" in determining whether bad faith is present so as to justify lifting the stay, including, without limitation:

- repeated bankruptcy filings by the same debtor;

- lack of equity in the subject assets;

- the existence of only few, relatively smaller claimants other than the moving secured creditor(s);

- the limited scope of a debtor's ongoing operations;

- any prepetition events leading toward foreclosure or receivership; and

- the absence of any reasonable possibility of an effective reorganization.

*Gunnison*, 320 B.R. at 400.

28.    Each of the above factors is applicable here.  This Debtor was in chapter 11 in Florida in 2014.  The secured noteholders appear to be "very" undersecured, in the Debtor's words, let alone there being enough value in the collateral for the estate to have equity therein.  The Secured Notes dwarf all other claims combined, and to this point, only 41 total claims have been filed in this chapter 11 case.  The Debtor's business has ceased being productive in any meaningful way, and after the termination of its authority to use collateral, it should currently be stopped entirely.  The Debtor and the Collateral Agent had discussed, earlier in 2018, an alternative wind down process such as an assignment for the benefit of creditors, which the Debtor determined to disregard in filing this case.  This combination of factors alone—lack of equity, a small creditor body, absence of cash flow or meaningful operations, and avoidance by a debtor of non-bankruptcy

remedies—has been squarely held to indicate bad faith in this District.  *In re Plateau Energy Partners, Inc.*, 2011 WL 5149080, at *6 (Bankr. D. Colo. Oct. 28, 2011).

29.     But most importantly, no reasonable possibility of reorganization exists now, nor, it is clear, did one ever exist in light of the Debtor's apparent motivation to ignore the secured noteholders' rights.  As discussed further below—the possibility of reorganizing is a consideration under section 362(d)(2) of the Bankruptcy Code, as well—the courts are no stranger to facts like these.  When a debtor is out to preserve equity for its current owners against the interests and wishes of its underwater secured creditors, and it fails to deliver any committed path forward to new financing or an exit from chapter 11, a finding that no reasonable possibility of reorganization exists is warranted.  *See Gunnison*, 320 B.R. at 402-04.

30.     Accordingly, cause exists under section 362(d)(1) to modify the automatic stay and permit the Collateral Agent to foreclose, both because the Debtor has not and cannot adequately protect against diminution in value of the collateral and because the Debtor's chapter 11 case has been in bad faith.

II.     **Modifying the Automatic Stay is Appropriate Because the Debtor Has No Equity in the Collateral and the Collateral Is Not Necessary to An Effective Reorganization.**

31.     In addition, relief for the Collateral Agent from the automatic stay should be granted under section 362(d)(2) of the Bankruptcy Code because the Debtor has no equity in its collateral and because no plausible reorganization is imminent.  Section 362(d)(2) of the Bankruptcy Code provides that stay relief shall be granted as to an action against property, such as foreclosure, if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."  11 U.S.C. § 362(d)(2).  As to the second element, it "means, as many lower courts...have properly said, that there must be a reasonable possibility of a successful reorganization within a reasonable time."  *Plateau Energy*, 2011 WL 5149080 at *3

14

(quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365, 375-75 (1988)) (internal quotation marks omitted). Furthermore, when a debtor is nearing the end of its 120-day plan proposal exclusivity window, the "reasonable possibility" standard imposes a heightened burden requiring a showing that a reorganization is "probable," meaning "having more evidence for than against or supported by evidence which inclines the mind to believe, but leaves some room for doubt." *See Plateau Energy*, 2011 WL 5149080 at *3 (quoting *In re Holly's, Inc.*, 140 B.R. 643, 702 (Bankr. W.D. Mich. 1992)).

32.     The *Gunnison Center Apartments* opinion is instructive.  There, the court examined section 362(d)(2)(B) and the reasonable possibility standard and concluded that the evidence before it "[did] not indicate that a successful plan [was] 'probable' or even 'plausible.'" *See* 320 B.R. at 402-04.  Chief among the facts before the *Gunnison* court were that:

- the debtor was "unable to operate and pay full debt service," *id.* at 402;

- the secured creditor would hold a blocking position as to unsecured claims on account of its deficiency claim, *id.*;

- the secured creditor had stated it would not vote in favor of any plan, *id.*;[11]

- the debtor's extant plan contemplated equity holders retaining ownership of the company, but the $700,000-$800,000 of new financing needed was not committed, other than the "'trust me' approach" of the sole owner of the debtor's general partner, who was the "driving force behind this bankruptcy filing," that financing would be procured, *id.* at 402-04; and

- readily observable legal infirmities with any plan structured as the debtor had indicated it would be—particularly gerrymandered voting classes to avoid the blocking position of the secured creditor's deficiency claim and the contemplated cram down interest rate—may have rendered it unconfirmable, *id.* at 404.

---

[11]    *See also Plateau Energy*, 2011 WL 5149080 at *5 (holding secured creditor's statement that it would not vote in favor of any plan that did not pay it in full indicated no reasonable possibility of reorganization).

33.     These facts map directly onto the instant case.  The Debtor is not meaningfully operating, is losing cash quickly, and will never be able to repay the Secured Notes.  The secured noteholders' deficiency claims, likely more than $2,000,000, would swamp the general unsecured claims class in any chapter 11 plan voting process, and the noteholders have made it very clear (here and elsewhere) that they will not support a reorganization.  The Debtor has estimated to the Collateral Agent it needs about $800,000 of new financing; but no party has committed to providing it, and the closest thing the Collateral Agent has seen to a commitment is the enthusiastic pledges of the Debtor's chairman (and significant shareholder) that the money is coming—the same sort of promise he made under oath at the October 9 hearing.[12]  Finally, given the secured noteholders' blocking position and the economic realities here, no plan will ever be proposed that can garner sufficient votes and satisfy the Bankruptcy Code's confirmation standards, particularly the absolute priority rule, the best interests requirement, and the feasibility test.

### III.     In the Alternative, Cause Exists to Convert This Case to Chapter 7.

34.     In the alternative, the Collateral Agent requests, pursuant to section 1112(b), that the Debtor's case be converted to one under chapter 7 of the Bankruptcy Code.  That section provides that a court "shall" convert a chapter 11 case to chapter 7 if "cause" exists to do so, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," "failure to maintain appropriate insurance that poses a risk to the estate or to the public," and "failure to comply with an order of the court."  11 U.S.C. § 1112(b)(4)(A), (C), (E).  Further, a court's analysis under subsection (A)—continuing loss to the estate and no likelihood of rehabilitation—has been likened to that used under section 362(d) of

---

[12]   *See* Hr'g Tr. (**<u>Exhibit D</u>**) at 30:15-17 ("Thirty days we could have offers on our table from legitimate business people to either buy out the debt-holders or to buy the company.").

the Bankruptcy Code for modifying the automatic stay.  *See In re White*, 535 B.R. 749, 758 (E.D. Mich. 2015) ("Because the Whites cannot show any error in the bankruptcy court's decision to convert their bankruptcy to a Chapter 7 proceeding, they likewise cannot show that the bankruptcy court erred in lifting the automatic stay imposed in their case."); *In re 51–53 W. 129th St. HDFC, Inc.*, 475 B.R. 391, 399 (Bankr. S.D.N.Y. 2012).

35.     In other words, all the justifications outlined above for lifting the automatic stay also support conversion of this case to chapter 7, if the Court believes that conversion is warranted in place of foreclosure.  The Collateral Agent would work diligently with the chapter 7 trustee after conversion to liquidate the collateral, whether through an agreed foreclosure process or otherwise.  While this likely would entail additional cost and time on the margins compared to moving straight to foreclosure, the important thing is that the Debtor would permanently cease operations and its management team and board, which have looked out only for the Debtor's shareholders (many of whom are current or former managers and officers) from the beginning, would be removed.

## **BANKRUPTCY RULE 4001 IS SATISFIED**

36.     To the extent applicable to this Motion, the requirements of Bankruptcy Rule 4001(a)(1) are satisfied by the provision of notice hereof as described below.

## **NOTICE**

37.     Notice of this Motion will be given to: (a) the Debtor; (b) the United States Trustee for the District of Colorado; (c) all entries of appearance; and (d) the parties included on the Debtor's consolidated list of twenty (20) largest unsecured creditors.  The Collateral Agent submits that, under the circumstances, no other or further notice is required.

**WHEREFORE**, the Collateral Agent respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, and grant such other and further relief as it deems just and proper.

Dated: December 28, 2018
      Denver, Colorado

*/s/ David Miller*
David Miller
**SPENCER FANE LLP**
1700 Lincoln Street
Suite 2000
Denver, Colorado 80203
Telephone:    (303) 592-8332
Facsimile:    (303) 839-3838
Email:      dmiller@spencerfane.com

- and -

Caroline A. Reckler
Jason B. Gott
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:      caroline.reckler@lw.com
          jason.gott@lw.com

*Counsel for the Collateral Agent*